IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:20-CR-00543-M-1

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MESSIAH MAY, <br><br> Defendant. | ORDER |

This matter comes before the court on Defendant's motion to suppress [DE 114]. The motion to suppress contends that a search warrant for 2031 Wickerleaf Way in Garner, North Carolina, was issued without probable cause. DE 114 at 1. The United States responded in opposition. DE 131. For the reasons that follow, the motion to suppress is denied.

I. **The Facts**[1]

As the court recounted previously:

> In 2012, law enforcement began to investigate [Defendant's] role within a violent drug trafficking organization. The organization was called the Family of Bosses Music Group ("FOB"), which operated across many states, including North Carolina, Georgia, New Jersey, and New York, and maintained close ties to other gangs such as the United Blood Nations and Nine Trey Gangsters ["NTG"]. As a member of the [NTG], [Defendant] also led the FOB.

DE 134 at 1-2.

During the course of the investigation, Defendant was ostensibly unemployed but drove several high-end vehicles and maintained residences in four different cities. DE 114-2 at 6. Within the NTG hierarchy, Defendant fell directly under Shamauri Carr, a state level leader of the

---
[1] The facts are derived from the parties' respective papers and the affidavit in support of the search warrant at issue here.

1

organization with national authority. *Id.* at 4, 6. Defendant's relationship with Carr has been corroborated by money transfers, human sources, and wire intercepts. *Id.* at 6.

In October 2016, law enforcement interviewed Cooperating Witness 1 (CW1) regarding the NTG's activities under Defendant in the greater Durham, North Carolina area. *Id.* at 9. CW1 provided information concerning various criminal activities, including prostitution, narcotics distribution, violent crime, bribery, and public corruption. *Id.* Most relevant here, CW1 reported that Defendant had developed a relationship with a Durham police officer (and federal task force officer). *Id.* According to CW1, this officer provided law enforcement information to Defendant and also solicited prostitutes through Defendant. *Id.* at 9-10. When shown a picture of several officers, CW1 identified Brian Cyr as the one who worked with Defendant. *Id.* at 10.[2]

In January 2017, Time Warner responded to an administrative subpoena from law enforcement that sought information regarding an IP address utilized by Defendant's Instagram[3] account. *Id.* at 7; DE 131 at 2. The IP address was linked to a cable account at 2031 Wickerleaf Way, and in the name of Jermaine Clack, another known NTG member. *Id.* Thereafter, law enforcement established surveillance at the address and observed a vehicle that Defendant frequently drove parked outside. *Id.* at 8. Law enforcement also observed a vehicle registered to Clack outside of the residence. DE 131 at 2.

In May 2017, law enforcement arrested a high-ranking NTG member in Wilson, North Carolina. DE 114-2 at 11. This gang member then gave law enforcement consent to search his phone. *Id.* On the phone, hidden in a folder labeled as a legitimate court document, law

---

[2] In May 2017, law enforcement interviewed Cooperating Witness 2 (CW2), a prostitute who was familiar with Cyr and reported that he had sexually assaulted her on multiple occasions. *Id.* Although CW2 met Cyr through Backpage, a website that facilitates illicit sexual encounters, *see id.*, the information she provided to law enforcement lends support to CW1's statement that Cyr obtained prostitutes through Defendant.

[3] Instagram is a social networking service that allows users to upload photos and videos with various filters and/or geographical tags.

2

enforcement found a series of documents containing news, rules, and other information related to the NTG. *Id.*

Later that month, another NTG member (CD1) was indicted in the Middle District of North Carolina. *Id.* In an interview, CD1 also provided information that Defendant worked with a "fed." *Id.* at 12. Like CW1, CD1 identified the officer who worked with Defendant as Cyr. *Id.*

On May 31, a state court judge authorized a pen register trap and trace (PRTT) on Defendant's Instagram account. *Id.* The PRTT indicated that Defendant was using his Instagram account inside 2031 Wickerleaf Way on June 7. *Id.* That same day, CW1 was interviewed by law enforcement, and indicated that Defendant previously maintained files on corrupt police officers and their families at his former home in Greensboro. *Id.* at 13. CW1 added that Defendant highly valued such information, and would likely maintain it at his primary residence. *Id.* CD1, during his debrief, also reported that he had previously observed another NTG member holding a photo of Cyr's child in Defendant's Greensboro residence a few years prior. *Id.* at 12.

On June 8, law enforcement sought a search warrant for 2031 Wickerleaf Way. *See generally id.* Based on all the information referenced above, Magistrate Judge Robert T. Numbers, II issued a search warrant for the residence the same day. *See id.* at 16.

On June 9, 2017, the FBI's Raleigh Durham Safe Streets Task Force executed a search warrant on 2031 Wickerleaf Way. DE 114 at 1. That search recovered a quantity of cocaine, drug paraphernalia, firearms, ammunition, and several thousand dollars in U.S. currency. DE 131 at 3-4. In a bedroom, law enforcement also found a driver's license, credit cards, and a credit report, all bearing Defendant's name. DE 114 at 1-2. Defendant seeks suppression of the evidence obtained from the residence on the grounds that the affidavit in support of the search warrant failed

3

to establish probable cause to believe that evidence of criminal activity would be found there. *See id.* at 1.

## II. Legal Standards

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). In that regard, warrantless searches are generally unreasonable, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), and a search warrant must be supported by probable cause, *United States v. Harris*, 403 U.S. 573, 577 (1971). Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see also United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011) (recognizing that "the concept of probable cause is not subject to a precise definition"). Generally, probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

When considering a challenge to a search warrant affidavit, a court must be able to conclude that "[s]ufficient information [was] presented to the magistrate to allow for the exercise of independent judgment." *United States v. Lalor*, 996 F.2d 1578, 1580–81 (4th Cir. 1993). The court does not decide de novo whether it would have granted the search warrant, only whether it was reasonable for the magistrate to have done so. *See United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011). Importantly, it is not necessary "that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded . . . upon information within the affiant's

4

own knowledge that sometimes must be garnered hastily." *Franks v. Delaware*, 438 U.S. 154, 165 (1978). To that point, search warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity . . . have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). With that in mind, a magistrate's finding of probable cause "should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236.

**III.    Analysis**

Although a close call, the court finds that probable cause supported the search warrant affidavit. Through the affidavit, evidence was presented to the Magistrate that Defendant was a high-ranking member of the FOB and NTG, organizations known to law enforcement to participate in an array of violent and otherwise criminal activity, and whose members frequently use their cellular phones in furtherance of their illegitimate enterprises. Both CW1 and CD1 provided information in 2017 that Defendant was corruptly working with Cyr, a federal task force officer. Further evidence was provided that Defendant had a practice of maintaining materials related to his relationships with corrupt law enforcement officers at his primary residence. Defendant valued such materials greatly. And the Time Warner subpoena, surveillance, and the PRTT collectively indicated that, from January-June 2017, Defendant resided at 2031 Wickerleaf Way. Combined with the gang-related information recovered from the high-ranking NTG member's phone shortly before execution of the warrant, there was probable cause to believe that Defendant both had incriminating gang-related information on his phone, and information related to his relationship with Cyr and/or other corrupt police officers at the residence. Accordingly, the warrant validly issued.

5

Defendant raises four arguments in support of the motion to suppress, which the court addresses in turn.

   a. The Reliability of the Cooperating Parties

"It is well settled that probable cause may be founded upon hearsay and information received from informants." *United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004). But information received from informants must bear sufficient "indicia of reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972). Defendant first argues that the search warrant affiant failed to show that information provided by the cooperating parties was reliable. DE 114 at 8. The court disagrees; the affiant did so on several occasions.

For example, the affiant noted that "CW1 has been providing information . . . for over seven months," and that the "information has proven to be extremely reliable and accurate and CW1's statements have been corroborated on most of the information provided." DE 114-2 at 13 n.1. This statement supports reliance on the evidence provided by CW1. As "[t]he Supreme Court has repeatedly recognized," a "proven, reliable informant is entitled to far more credence than an unknown, anonymous tipster." *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002) (referencing *Florida v. J.L.*, 529 U.S. 266, 270 (2000), and *Adams*, 407 U.S. at 146–147, respectively).

In addition, CW1 was interviewed by law enforcement. DE 114-2 at 9. "[A]n informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement." *DeQuasie*, 373 F.3d at 523. As a consequence, "courts have had no difficulty distinguishing between cases involving face-to-face encounters with informants and cases involving anonymous tipsters." *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000). The former enjoy a

6

greater presumption of reliability than the latter. *Adams*, 407 U.S. at 146–47; *see also United States v. Salazar*, 945 F.2d 47, 50–51 (2d Cir. 1991).

Because CW1 had regularly provided reliable information to law enforcement over a period of months, the court finds this factor weighs heavily in support of the Magistrate's conclusion as to probable cause. *See United States v. Lundy*, 164 F. App'x 332, 333-34 (4th Cir. 2006). "Although certainly it would have been preferable" if the affiant had provided additional details about specific examples of corroboration, "he did at least swear to the magistrate that he was relying on a known and proven confidential source," *Bynum*, 293 F.3d at 197, and the court recognizes the practical reality that warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation" and the court should not impose "[t]echnical requirements of elaborate specificity," *Ventresca*, 380 U.S. at 108.

The reliability of the information that CW1 provided is further evidenced by its corroboration by other sources. *See DeQuasie*, 373 F.3d at 522–23 (observing that "nature and circumstances of the report itself" may "provide [additional] indicia of reliability"). Revealing the depth of his knowledge of Cyr's relationship with Defendant, CW1 stated that Cyr would procure prostitutes through Defendant. DE 114-2 at 9-10. Then, when law enforcement interviewed CW2, she indicated that Cyr had obtained her prostitution services on multiple prior occasions. *Id.* at 10. That indication lends support to CW1's statement that Cyr obtained prostitutes through Defendant because it is consistent with one of the primary elements of Defendant and Cyr's relationship that CW1 described.

In addition, CW1 relayed that Defendant maintained materials pertaining to corrupt police officers and their families at a residence in Greensboro. *Id.* at 13. That statement was corroborated by CD1's report that he observed a NTG member holding a photo of Cyr's child in that residence.

7

*Id.* at 12. Because the affidavit's human sources provided consistent information, the court finds that the search warrant affiant did demonstrate the reliability of the cooperating parties. *See DeQuasie*, 373 F.3d at 522–23.

Defendant cites *United States v. Helton*, but that case is not on point. There, the affidavit merely described an informant as a "reliable source," but did not "contain any information to show the veracity or reliability of that source." *United States v. Helton*, 35 F.4th 511, 519 (6th Cir. 2022) (internal quotation marks omitted). Unlike in *Helton*, here the affiant detailed that CW1 had provided information to law enforcement over seven months, and that law enforcement had corroborated much of it. DE 114-2 at 13 n.1. In addition, CW1's statements related to Cyr, as well as Defendant's maintenance of materials related to corrupt police officers, were partially substantiated by other human sources. DE 114-2 at 9-10, 12-13. The Magistrate therefore did not need to rely solely on a conclusory statement of reliability.

Defendant also cites *United States v. Hicks* for the proposition that "the past reliability of an informant coupled with observation of active criminal conduct through . . . the informant . . . is enough to establish [probable cause]." DE 114 at 10 (citing *United States v. Hicks*, 64 F.4th 546, 554 (4th Cir. 2023)). But *Hicks* merely sets forth a sufficient standard for a finding of probable cause, not a necessary one. As noted, probable cause is "a fluid concept" that turns on "the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The use of controlled purchases such as those in *Hicks* would not have proved useful to the affiant in this racketeering investigation, which focused on bribery and corruption of a law enforcement officer. Based on (1) the affiant's sworn statements that CW1 had regularly provided reliable information, (2) that law enforcement had corroborated much of what CW1 reported, and (3) that several of CW1's statements are substantiated by other sources

8

in the affidavit, the court finds that the information in the affidavit from human sources bore sufficient "indicia of reliability." *Adams*, 407 U.S. at 147.

   b. Whether the Information Was Stale

"[T]ime is a crucial element of probable cause." *United States v. McCall*, 740 F.2d 1331, 1335 (4th Cir. 1984). "Consequently, part of a court's assessment of probable cause must consider whether the facts supporting it are so closely related to the time of the issuance of the warrant as to justify a finding of probable cause at that time." *United States v. Ebert*, 61 F.4th 394, 401 (4th Cir. 2023) (internal brackets and quotation marks omitted), *cert. denied*, 144 S. Ct. 149, 217 L. Ed. 2d 52 (2023). But there is no "pat formula" to consider the element of time, where the court could just "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *McCall*, 740 F.2d at 1336 (quoting *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)). Instead, like any other probable cause inquiry, considering time means considering time in context and in the totality of all other circumstances. *United States v. Richardson*, 607 F.3d 357, 370 (4th Cir. 2010).

Defendant asserts "that the evidence provided by the cooperators is too stale to support probable cause to search 2031 Wickerleaf Way in 2017." DE 114 at 13. Not so. The witnesses stated that Defendant was, at the time the warrant was to issue, then acting as a high-ranking member of the NTG, with all of the leadership responsibilities that attached. Although the investigation into the NTG and FOB began years earlier, evidence related to that residence did not emerge until 2017, when the Time Warner subpoena reflected Defendant's use of his Instagram account there. DE 114-2 at 7; DE 131 at 2. Moreover, both CW1 and CD1 provided statements, in 2017, that Defendant had a relationship with Cyr. *Id.* at 9-10, 12. That evidence was therefore

9

"closely related to the time of the issuance of the warrant [so] as to justify a finding of probable cause." *Ebert*, 61 F.4th at 401.

CW1 and CD1 also indicated that Defendant kept materials related to corrupt officers and their families in his primary residence. *Id.* at 12-13. As the *McCall* Court recognized, "[i]n some circumstances, the very nature of the evidence sought may suggest that probable cause is not diminished solely by the passage of time." *McCall*, 740 F.2d at 1336. Records and files that an individual deems valuable "are the sort which would normally be kept at one's personal residence," and "are also the sort which could be reasonably expected to be kept there for long periods of time." *United States v. Freeman*, 685 F.2d 942, 952 (5th Cir. 1982).

CW1 reported that Defendant considered his files on corrupt police officers to constitute his "insurance policy." DE 114-2 at 13. An "insurance policy" is retained until it can be employed to the benefit of the person who holds it. Applying common sense conclusions about human behavior, *see Gates*, 462 U.S. at 230, that is the sort of evidence that Defendant could reasonably be expected to keep for a "long period[] of time," *Freeman*, 685 F.2d at 952.

In sum, the court finds that the human source reports about Defendant's relationship with Cyr were not stale. Both CW1 and CD1 reported the existence of the relationship in 2017. Those consistent reports reasonably permit the inference that the relationship was ongoing when reported. And although CW1 and CD1 provided evidence pertaining to Defendant's files that was a few years old, Defendant considered those files to be his "insurance policy," so he would have held on to that material (or similar material) for a lengthy period.

Defendant's citation to *United States v. Henry* does not advance his argument. There, the Fourth Circuit affirmed the denial of a motion to suppress. *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012). To be sure, in so doing the court recognized that some of the evidence in the

10

affidavit was "not based on recently-acquired information." *Id.* at 290. But the court emphasized that arguably stale pieces of evidence should not be "isolate[d]" or "considered separately." *Id.* Rather, the court concluded that the evidence, although not recent, was reliable because multiple disparate sources provided consistent information. *See id.* ("when considered collectively, that information demonstrated that three individuals with no connection to one another provided consistent statements regarding the [defendants'] alleged illegal conduct").

Unlike in *Henry*, here the court finds that the evidence of Defendant's relationship with Cyr was not stale because CW1 and CD1 reported its existence in 2017, and further finds that the reports of Defendant's "insurance policy" were not stale due to the nature of those materials. *See* DE 114-2 at 7-13. But even if that evidence was stale, the court would, consistent with *Henry*, find that evidence reliable because it reflects multiple individuals with no apparent connection to one another providing consistent information about Defendant's criminal activities. *See Henry*, 673 F.3d at 290. The age of the evidence, considered in the totality of the circumstances, supports a finding of probable cause.

c. Nexus between Criminal Activity and the Residence

Defendant further contends that the affidavit failed to establish a nexus between criminal activity and 2031 Wickerleaf Way. DE 114 at 17. "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *Lalor*, 996 F.2d at 1582. In other words, even compelling evidence that an individual is engaged in criminal activity is insufficient to justify a search warrant in the absence of evidence of a link between the individual's criminal activity and the place to be searched. *Cf. Steagald v. United States*, 451 U.S. 204, 212–13 (1981) (explaining that although "an arrest

11

warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ"); *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) ("probable cause to arrest a person will not itself justify a warrant to search his property"). With this inquiry, the "nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). Importantly, a "sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence." *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).

At the outset, the court finds that the affidavit contains sufficient information for the Magistrate to have reasonably concluded that Defendant resided at 2031 Wickerleaf Way. First, the affidavit reflects the affiant's knowledge that Defendant maintained residences in the Raleigh-Durham area. DE 114-2 at 7. Garner is located in that area. Second, in January 2017, the Time Warner subpoena response revealed that Defendant was using his Instagram account at that residence. *Id.* Third, physical surveillance at the residence led law enforcement to observe a vehicle that Defendant frequently drove parked outside. *Id.* And fourth, the PRTT indicated that Defendant was using his Instagram account inside 2031 Wickerleaf Way on June 7, 2017. *Id.* at 12. Four pieces of evidence linking Defendant to that residence over a period of months supports the conclusion that Defendant resided there. *See United States v. Jones*, 763 F.3d 777, 795–96 (7th Cir. 2014) (GPS data of defendant's cell phone at residence as well as sighting of his vehicle there in early morning hours was "substantial evidence" that supported court's finding that residence was at least "one location" where defendant resided).

12

In addition, there was probable cause to believe that there would be two categories of evidence of criminal activity at the residence. First, Defendant's phone was likely in the residence. He used his Instagram account there on multiple occasions and was unemployed, DE 114-2 at 7, 12, so he would have no apparent reason to leave the residence for regular or extended periods. Therefore, because humans today use cell phones with such frequency "that the proverbial visitor from Mars might conclude they were an important feature of human anatomy," *Riley*, 573 U.S. at 385, it would be reasonable to conclude that Defendant's cell phone would be on his person, in the residence. *See also United States v. Grupee*, 682 F.3d 143, 146–47 (1st Cir. 2012) (where it was reasonable to believe defendant possessed phone, and reasonable to believe defendant resided at certain address, "there was a substantial basis to find probable cause that the cell phone . . . would be in [the defendant's] possession, and be found at [the address]").

There was also evidence presented that Defendant's cell phone would contain evidence of criminal activity. Defendant was a high-ranking member of the NTG and the leader of the FOB, known "violent" criminal organizations. DE 114-2 at 6. Based on the affiant's training and experience, gang members "frequently use cellular phones to further their illegal activities." *Id.* at 2. And the affiant's experience is borne out by specific example: less than three weeks before the search warrant was executed, a high-ranking NTG member was arrested in a neighboring city, and a "large document" containing gang-related information was found on his cell phone. *Id.* at 11. Based on the foregoing, it was reasonable to conclude that like evidence of criminal activity would be found on the phone of Defendant, another high-ranking NTG member in the Raleigh-Durham area. *See Riley*, 573 U.S. at 399 ("In the cell phone context, [] it is reasonable to expect that incriminating information will be found on a phone regardless of when the crime occurred.").

Separate and apart from the cell phone, there was also probable cause to believe that materials related to Defendant's relationship with corrupt police officers would be found in the residence. Both CW1 and CD1 provided information supporting that Defendant possessed such material. *Id.* at 12-13. CW1 expressed that Defendant considered that material to be his prized possession, a form of "insurance policy," and would keep it at his primary residence. *Id.* at 13. And the Magistrate could reasonably infer that Defendant's primary residence was no longer in Greensboro. *Id.* at 7 (listing Defendant's residences, which include Raleigh and Durham, but not Greensboro). Accordingly, based on the information linking Defendant to 2031 Wickerleaf Way throughout 2017, there was probable cause to believe that Defendant primarily resided there, and that his "insurance policy" would be stored there. *See United States v. Hills*, 27 F.4th 1155, 1192 (6th Cir. 2022) (holding that sufficient nexus existed between bribery scheme and defendant's home where scheme was ongoing for several years and business records were sort of evidence that would be kept for long periods of time, even though defendant also owned several local businesses where records could also be kept).

As the Fourth Circuit observed in *Grossman*, a "sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence." *Grossman*, 400 F.3d at 217. That observation is based on the common-sense principle that the "nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Anderson*, 851 F.2d at 729; *see also Freeman*, 685 F.2d at 952 (concluding that records and files "are the sort which would normally be kept at one's personal residence," and "for long periods of time").

14

Case 5:20-cr-00543-M   Document 157   Filed 08/29/24   Page 14 of 18

Here, there was evidence that Defendant maintained a dossier on corrupt police officers, highly valued that dossier, and kept it at his primary residence as an insurance policy. DE 114-2 at 12-13. Although that evidence was not directly linked to 2031 Wickerleaf Way, it was reasonable to link that evidence to the residence in June 2017, based both on Defendant's activity there as well as the nature of the materials. *Grossman*, 400 F.3d at 217; *Anderson*, 851 F.2d at 729; *Freeman*, 685 F.2d at 952. Between the cell phone evidence and the dossier, the court finds that the affidavit provided a sufficient nexus between criminal activity and 2031 Wickerleaf Way.

### d. Basis of Knowledge Underlying the Allegations

Lastly, Defendant argues that "there was no basis of knowledge to support probable cause." DE 114 at 24. The court interprets this final argument as one generally targeting the strength of probable cause. Substantively then, this argument covers much of the same ground as Defendant's argument about the reliability of the human sources referenced in the affidavit. *See supra* at 6-9. Because the court has found that the human sources were reliable, it likewise finds that the Magistrate could reasonably rely on the evidence they provided in the warrant affidavit. Moreover, the affiant provided additional information in the affidavit that was based on his training and experience, as well as the multi-year investigation into NTG and FOB, which is reflected by significant detail in the affidavit. DE 114-2 at 3-7. The Magistrate could reasonably rely on that evidence as well in making a probable cause determination.

Defendant's citation to *United States v. Barronette* is unpersuasive because the particular investigative techniques available to law enforcement in drug distribution cases (physical surveillance of transactions, controlled purchases, etc.) less readily lend themselves to the racketeering and public corruption investigation that was the subject of the search warrant affidavit here. *See United States v. Barronette*, 46 F.4th 177, 195-96 (finding probable cause supported

15

issuance of tracking order based on reports from human sources, surveillance, and controlled purchases). Like the *Hicks* case referenced previously, *Barronette* merely demonstrates one sufficient standard for a showing a probable cause. But probable cause can be based on different showings in different contexts; it is "a fluid concept" based on the totality of circumstances. *Gates*, 462 U.S. at 232.

Considering the totality of the circumstances, the court finds that the evidence contained in the affidavit was "sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas*, 517 U.S. at 696. Defendant was identified as a high-ranking member or leader of two criminal organizations. DE 114-2 at 6-7. Members of such organizations typically maintain incriminating evidence on their phones. *Id.* at 2, 11. In addition, multiple human sources reported that Defendant had a relationship with a corrupt federal task force officer. *Id.* at 9-10, 12. Those sources also indicated that Defendant maintained a dossier on corrupt officers at his primary residence. *Id.* at 12-13. And multiple pieces of evidence, including a subpoena response, physical surveillance, and a PRTT linked Defendant to 2031 Wickerleaf Way. *See id.* at 7-13. In the aggregate, "[s]ufficient information [was] presented to the magistrate to allow for the exercise of independent judgment." *Lalor*, 996 F.2d at 1580–81.

e. Good-Faith Exception

Even if the warrant issued without probable cause, the court would find the good-faith exception applicable. Suppression of evidence under the exclusionary rule serves to deter culpable police conduct. *See Davis v. United States*, 564 U.S. 229, 240 (2011) (emphasizing that exclusionary rule has "never" been applied "to suppress evidence obtained as a result of nonculpable, innocent police conduct"). The deterrent objective of the exclusionary rule is not

advanced when police officers obtain evidence with "the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 909 (1984). "Hence, under *Leon's* good faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was objectively reasonable." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (internal quotation mark omitted).[4]

The good-faith exception itself has four exceptions, but none apply in this case. There is no suggestion that the affiant made recklessly false statements, that the Magistrate acted as a mere rubber stamp to law enforcement, or that the affidavit was so facially deficient that reliance on it was entirely unreasonable. *See United States v. Williams*, 548 F.3d 311, 317–18 (4th Cir. 2008). Although Defendant has argued that the affidavit failed to establish probable cause, it was not "*so lacking* in indicia of probable cause as to render official belief in its existence *entirely unreasonable*." *Leon*, 468 U.S. at 923 (emphasis added). Put another way, the 16-page affidavit in this case cannot fairly be described as "bare bones." *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996); *cf. Aguilar v. State of Tex.*, 378 U.S. 108, 109 (1964) (invalidating search warrant that issued based on one-sentence affidavit). The court thus finds that, even if the warrant was issued without probable cause, officers would have reasonably believed that their search of 2031 Wickerleaf Way "was in accord with the Fourth Amendment." *Leon*, 468 U.S. at 909. Suppression therefore is not an appropriate remedy.

---

[4] Although neither party raises the good-faith exception, the court finds consideration of it is appropriate. *E.g., United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("The party presentation principle is supple, not ironclad."); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

17

## IV. Conclusion

The warrant affidavit established probable cause to believe evidence of criminal activity would be found at the residence. Even if it didn't, the good-faith exception would preclude suppression of the evidence recovered. Defendant's motion to suppress [DE 114] is DENIED.

SO ORDERED this 29th day of August, 2024.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE